THE NEW YORK ACADEMY OF MUSIC *v.* JAMES H. HACKETT.

To work a forfeiture of a lease for the non-payment of rent, a demand must be made upon the demised premises, at a convenient time before sundown, on the day the rent falls due; and the exact amount must be demanded.

The tenant, in such a case, has until midnight to pay the rent, and until the whole day has actually expired, the landlord cannot put in force his right to re-enter.

Forfeitures of this description are not favored in the law, and therefore, when it is insisted on, a demand of rent due must be shown with great particularity.

A denial in an answer, in an action brought to recover rent, of "each and every allegation in the complaint, wherein and whereby the defendant is charged with being liable for any rent to the plaintiffs, or of any sum being due or owing from him to them," puts at issue an averment in the complaint "that the rent was, as it became due, duly demanded." HILTON, J., *dissenting.*

An entry by the landlord upon demised premises, and excluding the tenant therefrom, is an eviction of the tenant, and suspends the payment of any rent falling due thereafter, until he is restored to the possession.

But an eviction will not discharge the tenant from liability for rent previously due.

An opera house was rented for two months, the rent to be paid weekly, and "nonpayment of rent to forfeit lease." The house was to be accepted in the condition in which it was—the owners, however, agreeing to use all diligence in finishing it. The tenant entered into occupation of the premises, using them for operatic performances, in which Grisi and Mario were the prominent attractions. The building remaining unfinished, with but six furnaces put up out of the fifteen contemplated; Mario was taken with a cold and hoarseness which prevented a continuance of his performances, resulting in an illness from which he did not recover for several weeks. The rent being unpaid for *two* weeks, on the last day of the *third* week the landlord peaceably excluded the tenant from the premises. On the day of the eviction the tenant had announced the first representation of the opera of "Semiramide" on the ensuing week, and had incurred expense in advertising, printing, &c., therefor. In an an action on the lease, brought to recover for the *three* weeks' rent—*Held,*

I. That, upon the tenant showing a breach of the agreement on the part of the landlord to use all diligence in finishing the house, he was entitled to counterclaim his damages in consequence.

II. That the damages claimed to have resulted from the loss of Mario's services by illness arising from cold and hoarseness produced by the unfinished condition of the house, and in respect to which the gains or profits must of necessity be purely speculative and conjectural, were too remote and uncertain to form the subject of a counter claim, and could not therefore be allowed. BRADY, J., *dissenting.*

III. Damages recoverable upon a breach of contract are only such as can be ascertained and fixed with reasonable certainty; and this cannot be done in respect to profits anticipated from the future public performances of a vocalist.

IV. That he was entitled to be allowed, in abatement of the rent, the damages occasioned by the eviction—and which, in this case, consisted of the expenses of advertisements, printing, &c., in announcing the performances of the week following the eviction.

*Per* HILTON, J., (and INGRAHAM, F. J.)—In an action for rent, against a tenant occupying demised premises, he cannot be permitted to claim, in abatement or extinguishment of the rent, that the premises were unfit for habitation, or for the purposes intended by him at the time of hiring.

APPEAL by defendant from an order at special term refusing a motion for a new trial.

This action was brought to recover three weeks' rent under the following agreement:

MEMORANDUM.of an agreement between the New York Academy of Music and James H. Hackett, for a lease of the Academy for a period of two months from the first day of October, one thousand eight hundred and fifty-four.

1. The rent to be nine thousand five hundred dollars—five hundred dollars payable on the thirtieth day of September, and one thousand dollars on the succeeding Saturday of each week until the whole amount is paid.

2. Two hundred free admissions, with a seat selected and secured, reserved to the Academy.

3. The use of a room for directors.

4. The right of having one or more watchmen or firemen in the building with free access to all parts, and control of the fire plugs, cistern, outlets, hose and necessary adjuncts; also a lodging room.

5. Free access to the building for directors or executive committee.

6. Mr. Hackett not to let or underlet any portion of the building, except saloons; and not to assign his lease.

7. The house to be accepted in the condition in which it is. The directors, however, to use all diligence in finishing, and to have the main saloon cleared up on the night of every performance.

8. Mr. Allegri to have use and control of the painting room and carpenters' shop until his contract is finished; other parts of the building to be in the control, during the day, of the necessary mechanics.

9. The building to be used for operatic performances, oratorios, concerts of a classic character, English and French comedies or vaudevilles, ballets and balls of a respectable character.

10. Non-payment of rent to forfeit lease.

11. No scenery to be altered or repainted except by or under the direction of Mr. Allegri, without consent of the executive committee.

12. The Academy reserves the right of increasing the free admissions to three hundred on payment, by a deduction from the rent, of the price of admission to the lessee.

13. In case of fire, the rent to cease unless forthwith repaired.

Dated New York, 27th September, 1854.

WM. H. PAINE, Sec'y.

JAS. H. HACKETT.

C. BAINBRIDGE SMITH.

The complaint averred that the rent due on the 21st and 28th of October, and on the 4th of November, amounting in all to $3,000, was unpaid, "though payment thereof, as it became due, was duly demanded of said defendant."

The answer averred—I. That the plaintiffs failed to use due diligence in completing the building according to their contract, in consequence of which M. Mario, one of the defendant's artists, was made sick and the defendant was incapacitated from giving the necessary operatic representations to his damage $3,000 ; II. That on the 4th of November he was evicted by the plaintiffs ; III. That in consequence of such eviction he was prevented from giving operatic representations, to his damage ; IV. That the plaintiffs were indebted to him on a sale of some tickets, and also for some scenery, &c., which they had unlawfully converted to their own use ; and the answer closed with this averment : V. "And the defendant denies each and every allegation of the complaint wherein and whereby he is charged with being liable for any rent to the plaintiffs, or of any sum being due or owing from him to them, and demands judgment in his favor against the plaintiffs in the sum of five thousand dollars."

To this answer a reply was interposed, denying all the allegations therein contained except that in respect to the sale of the tickets, on account of which the plaintiffs admitted an indebtedness of $26.

Upon the trial before Hon. D. P. INGRAHAM and a jury, it appeared that on the 4th of November, 1854, William H. Paine, the secretary of the plaintiffs, called at the Academy of Music to collect the rent; that he remained there for that purpose until 6 o'clock P. M., at which time, the defendant having gone away, he gave one James F. Tunison, who was in charge of the Academy on behalf of both parties, direction to close the building and not to permit any person to enter without an order from him or the president of the plaintiffs, Mr. Phalen. This was done by order of the board of directors of the plaintiffs. Mr. Tunison closed the house accordingly. This was on a Saturday night. Mr. Paine at the same time prepared, and left to be served on the defendant, a notice in these words:

JAMES H. HACKETT, ESQ.,

Dear Sir:—You are hereby notified that the unexpired term of your lease of the N. Y. Academy of Music building is forfeited by the non-payment of rent due this day, and that the building is closed.

By order of the directors.

.WM. H. PAINE, Sec'y.

New York, Nov. 4th, 1854.

It further appeared that when the defendant first took possession of the house, but three furnaces had been put in; that on the 16th of October there were but six in the house; that both performers and audience complained bitterly of the cold; that Grisi and Mario, who were defendant's principal performers, complained of the cold, and said that they had both sung at St. Petersburgh, but never had experienced such cold there. It was intended to have put fifteen furnaces in all into the house, and the testimony showed that they might all have been put in in two days if a sufficient number of men had been employed.

The defendant then offered to prove that on the evening of the 16th of October, 1854, Mario was well when he commenced his performance at the Academy of Music, and during his perform-

ance was taken with a cold and hoarseness which prevented his going through with his performance; that such cold and hoarseness arose exclusively from the coldness and dampness of the house; and that such coldness and dampness resulted from the neglect of the plaintiffs to finish the building, and to put the furnaces in order, and that Mario's illness continued for about four weeks, during which time the defendant was entirely deprived of his services and lost great gains and profits thereby. The plaintiffs objected to each and all of the foregoing, and the court excluded any testimony upon the same, to which the defendant's counsel excepted.

The defendant then offered to show that a representation was announced for Monday, the 6th of November, viz., "Semiramide," on the Saturday before the closing of the Academy against Mr. Hackett by Mr. Paine, and that great expense had been incurred by bills and advertisements.

The plaintiffs' counsel objected thereto, the court excluded the same, and the defendant duly excepted.

The case being then closed, was submitted to the jury, who rendered a verdict for the plaintiffs for $1,634.13. The defendant then moved at special term on a case for a new trial. The motion was denied, and the following opinion was rendered:

INGRAHAM, First Judge.—The evidence offered by the defendant to show the damages he has sustained by the closing of the Academy, was intended to prove that during the performance previous thereto, Mario, one of the performers, was taken with a cold and hoarseness, which prevented him from performing, which resulted from the neglect of the plaintiffs to make the necessary provision for warming the building; that his sickness continued for four weeks, and in consequence thereof the defendant sustained loss of gains and profits he expected.

This evidence was excluded on the ground of its uncertainty and remoteness. I see no reason to change the opinion expressed at the trial. The damage supposed to arise from such a case is *altogether too remote and uncertain*, both as to the cause, the na-

ture and the consequences, to warrant the court in admitting it after the defendant had seen fit to use the building for the purpose for which it was rented.

When a building is unfit for the use contemplated, if the tenant has a remedy for such unfitness he must seek it either by charging the landlord with the expense of remedying the defects, or by refusing to use the premises, and thereby exonerate himself from liability under the contract of hiring.    But a tenant has no right to use demised premises, which he knows to be unfit for occupation, in such a way as to cause damage and loss, and then seek to recover from his landlord for the damages so occasioned by his own acts, was held by us in this court some years since in *Nichol* v. *Dusenbury*, where the tenant, knowing that the roof of a house he had hired was unfinished and permitted the rain to come through, instead of repairing the roof, placed his goods in the store, which were there damaged by the rain.    The court held the tenant could not recover such damage.

The rule is the same whether the damage is produced by water on goods or by exposure to cold, either in property or person. If the building is unfit for the purpose contemplated, then the tenant should not use it, and should seek redress in another form.

The mere notice to the tenant was not an eviction, and the evidence does not show any actual eviction prior to the time when by the contract the lease was to terminate.

The matters offered by the defendant, and which were excluded, relating to the supposed damages sustained by him, were not, in my judgment, admissible for that purpose, and the rulings in regard to them were not erroneous.

Motion for new trial refused.

From the order entered pursuant to this opinion, the defendant appealed.

*C. Bainbridge Smith*, for the appellant.

I. In order to produce an eviction, it is not necessary there should be an actual physical expulsion. *Pendleton* v. *Dyott*, 8 Cow.

727; *Gilhooley* v. *Washington,* 4 Comst. 217; *Luckey* v. *Frantzkee,* 1 E. D. Smith, 47; *Lawrence* v. *French,* 25 Wend. 443; *Ogilvie* v. *Hull,* 5 Hill, 52; *Lloyd* v. *Tompkins,* 1 T. R. 671; *Burns* v. *Phelps,* 1 Stark. 94. 1. An eviction consists in taking from the tenant the whole or some part of the demised premises. Id. So, in *Burns* v. *Phelps,* (*supra*), where the landlord gave notice to an under tenant to quit, and he did accordingly, it was held to amount to an eviction. So in *Lloyd* v. *Tompkins,* (*supra*), per ASHURST: "But here the act itself asserts a title; *for the defendant locked the pew, which is as strong an assertion of right* as can well be imagined." 2. The defendant had the whole of the 4th of November, that is, till 12 o'clock midnight of that day, in which to pay the rent due. *Giles* v. *Comstock,* 4 Comst. 270, 273; *Smith* v. *Shepard,* 15 Pick. 147; *Duppa* v. *Mayo,* 1 Saund. 287. 3. The plaintiffs did not make any formal demand of the precise sum due for rent, before they entered the premises and evicted the defendant therefrom. Taylor's Land. and Ten., § 297, and cases cited; *Jones* v. *Kip,* 3 Wend. 231. 4. A wrongful eviction of the tenant by the land lord, of the whole or part of the demised premises, suspends the rent. *Christopher* v. *Austin,* 1 Kern. 216; *Giles* v. *Comstock,* 4 Comst. 275. 5. The facts disclosed in the case at bar show an ouster—an actual physical expulsion of the tenant by the land-lord on the 4th of November, 1854, the whole of which day the defendant had to pay the rent.

II. The defendant was unlawfully evicted from the demised premises by the plaintiffs, and he should be allowed such damages as he sustained by reason of the plaintiffs' unlawful acts. 1. An action by the defendant in the nature of the former action of trespass would have lain against the plaintiffs. Taylor's Land. and Ten. (2d ed.) § 785; *Hilary* v. *Gay,* 6 Car. & P. 284, (25 E. C. L. R. 398.) 2. Such eviction being an abuse of an authority in law, makes the entry a trespass *ab initio,* and therefore, if a party ousted bring trespass, the defendant cannot justify the expulsion for want of a lawful possession, and whether the entry was forcible or not is a question for the jury. *Newton* v. *Howland,* 1 Scott N. R. 491; 1 M. & Gr. 644, (39 E. C. L. R. 581);

*Flaherty* v. *Andrews*, 2 E. D. Smith, 529. 3. The defendant offered to prove, that on the Saturday (4th November, 1854) before the closing of the building against the defendant, a representation of the opera of "Semiramide" was announced for the Monday following, and that before and at the time of such expulsion great expenses had been incurred by him for the bills and advertisements. The counsel for the plaintiffs objecting thereto, the court excluded the same, and the defendant excepted. 4. It must be assumed that such proof could be adduced, and that the defendant did sustain the damages attempted to be proved. *a.* The premises were let to the defendant for certain specified purposes, among others that of giving operatic entertainments, in which Mario and Grisi appeared; and that business was being carried on when he was unlawfully evicted by plaintiffs. *b.* Advertising and other expenses incidental to such entertainments had been incurred and lost by reason of the eviction. Such items of damages would be admissible in an action of trespass brought by the defendant against the plaintiffs; and proper by way of recoupment, or in abatement of the plaintiffs' claim in an action arising either from the breach of the plaintiffs' covenant, or their acts which occasioned them. *The Mayor* v. *Mabie*, 3 Kern. 151, 153; Taylor's Land. and Ten. (2d ed.) §§ 373–4, 785; *Driggs* v. *Dwight*, 17 Wend. 71; *Freeman* v. *Clute*, 3 Barb. S. C. R. 424; *Lawrence* v. *Wardell*, 6 Id. 423–6; *Masterton* v. *Mayor of Brooklyn*, 7 Hill, 62; *Waters* v. *Towers*, 20 Eng. L & Eq. R. 410. 5. Such damages are not too remote. Id.

III. The covenant of the plaintiffs is to use all diligence in finishing the house; and this, in connection with the limited term for which the defendant hired it, rendered it incumbent on the plaintiffs to use more than ordinary exertions to fulfill their covenant. Chitty on Contracts, 735, 736; *Crocker* v. *Franklin H. & F. Manufg. Co.*, 3 Sumn. 530; *Kerby* v. *Harrison*, 2 Ohio (N. S.) 396. 1. The defendant offered to prove that, by reason of the plaintiffs violating their covenant to finish the building, he was unable to proceed with the business for which the building was expressly leased to him, and had sustained great loss,

and been deprived of the services of those he employed, and of great gains and profits. *Whitbeck* v. *Skinner*, 7 Hill, 53. 2. What such losses were, or how and in what manner the defendant was damnified and deprived of making great gains and profits, the court refused to let the defendant prove, and to which the defendant excepted. 3. The plaintiffs let the premises in question for a particular purpose, and restricted him by the lease to such purpose; and the sole question is, if the defendant was deprived of the use of the premises by reason of the non-fulfillment of the contract on the part of the plaintiffs, and sustained damages thereby, whether he is remediless? *a.* Such damages might be merely the value of the premises, irrespective of what the defendant agreed to pay for them. *Driggs* v. *Dwight*, 17 Wend. R. 71; *Trull* v. *Granger*, 4 Seld. R. 115. *b.* They might consist of the services of those persons whom the defendant was under contract to pay, and of whose services he was deprived by the acts of the plaintiffs. *c.* They might consist of the expenses of preparing the opera "Semiramide." *d.* The court could not correctly hold that the testimony was inadmissible, or the damages too remote, until it was ascertained what they consisted of. But at all events the defendant was entitled, as damages, to any expense he had actually incurred in his business, as a consequence of the failure of the plaintiffs in not performing their covenant. *Driggs* v. *Dwight*, 17 Wend. 71; *Whitbeck* v. *Skinner*, 7 Hill, 53; *Freeman* v. *Clute*, 3 Barb. S. C. R. 424; *Lawrence* v. *Wardell*, 6 Id. 423–6; *Masterton* v. *The Mayor, &c.*, 7 Hill R. 62: *Waters* v. *Towers*, 20 Eng. Law & E. R. 410; *Fisher* v. *Barrett*, 4 Cush. 381. *e.* Such damages may be set up in abatement of the plaintiffs' claim. Id.; *The Mayor, &c.* v. *Mabie*, 3 Kern. 151.

*F. A. Lane*, for the respondents.

I. The justice who tried the cause did right in excluding any testimony in regard to the illness of Mario. *a.* Every set-off must arise upon contract, or be connected with the subject matter of the transaction. The illness of Mario was neither of these. Code, § 150; *Cram* v. *Dresser*, 2 Sand. Sup. Ct. Rep. 120. *b.* Such

a set-off is too remote and contingent. *c.* The offer of defendant's counsel to show that Mario's cold and hoarseness arose exclusively from the coldness and dampness of the house, was an offer to show an impossibility—for what physician so astute as to know that the seeds of the disease were not about him before he went to the building.

II. The fact that the Academy of Music was too cold for operatic performances, or even was entirely unfitted for such performances, would in itself have given no right of set-off or recoupement to the defendant. *a.* The house was to be accepted in the condition in which it was. *b.* Even where a building is let for a special purpose, and its use or occupation for any other is prohibited, there is no implied contract or warranty on the part of the landlord that the building shall be, or continue, fit for the purpose for which it is demised. *Howard* v. *Doolittle*, 3 Duer, 464, and cases there cited. *c.* Nor, if the building ceases to be habitable, or is wholly destroyed, is the tenant discharged from the payment of the whole or any part of the rent. He can only be so by express agreement. *Howard* v. *Doolittle*, cited above.

III. The justice did right in refusing to charge that there was an eviction on the 4th of November, 1854. *a.* To constitute an eviction, there must be some deliberate interference on the part of the landlord with the possession, depriving the tenant of the beneficial enjoyment of the demised premises. Words or directions to employees amount to nothing. The *act* must be done. *Ogilvie* v. *Hull*, 5 Hill, 52 ; *Bennett* v. *Bittle*, 4 Rawle, 343. *b.* The evidence shows that the person who had charge of the building during the whole time defendant occupied, did not close the building until after the defendant had left the building for the night. *c.* The evidence shows no interference with the defendant's possession until Sunday morning, November 5th, 1854, and nothing then amounting to an eviction.

IV. The rent, for which action is brought, had accrued *previous* to any eviction, and therefore such eviction (if there was any) cannot be set up as an extinguishment. *a.* The landlord,

after he has re-entered for a forfeiture of the lease, may recover the rent which accrued previous to such forfeiture in an action for debt, or in an action upon the covenants in the lease. *Stuyvesant* v. *Davis*, 9 Paige, 427; see, also, 2 Greenleaf's Cruise, 103; *Giles* v. *Comstock*, 4 Com. 275; *Remem* v. *Smith*, 1 Smith's Ct. Appeals, 332. *b.* Non-payment of rent forfeited the lease, and the plaintiffs had a right (if they chose) to prevent the defendant from entering on Sunday morning, inasmuch as the lease was forfeited.

V. The justice did right in excluding all testimony in reference to the opera "Semiramide," and all matters connected therewith, and also all testimony as to damages by reason of the non-performance. *a.* Any damages which might have arisen thereunder are too remote and contingent to be made the subject of set-off. *Trull* v. *Granger*, 4 Selden, 115. *b.* The measure of damages is the difference between the rent reserved and the value of the premises for the term, and this measure is the same whether the action be on contract or in tort. *Hull* v. *Granger*, cited above; *Kelly* v. *The Dutch Church of Schenectady*, 2 Hill, 105; *Kinney* v. *Watts*, 14 Wend. 38; *Moal* v. *Johnson*, 1 Hill, 99.

VI. The directors used all reasonable diligence in finishing, and this was all they were required to do.

BRADY, J.—The testimony does not show that any demand for the rent was made. It is alleged in the complaint that the rent which accrued on the 21st and 28th days of October, and the 4th of November, 1854, as it became due, was duly demanded, but it is admitted in the reply that $26 should be deducted from the rent claimed in the complaint. It does not appear at what time of the days, on which the rent fell due, it was demanded; but it appears that on the 4th of November, 1854, and at about 6 P. M. of that day, Mr. Paine, who was acting on behalf of the directors of the Academy of Music, directed Mr. Tunison to close the building, and not to permit any person to enter it without an order from Mr. Phalen, the president of the Academy, or himself. And it further appears that Mr. Tuni-

son acted according to orders—locked the doors, and did not allow any person to enter. From this statement of the evidence it is apparent that on the. 4th of November, 1854, and at about 6 P. M., the plaintiffs took possession of the building with the intention of excluding the defendant therefrom, and that their orders to that effect and purpose were carried out. The agreement contained a provision, as follows: " Non-payment of rent to forfeit lease;" but it is well settled that, on leases 'containing a similar covenant, agreement, or condition, the landlord's right to re-enter is not perfected until he makes a demand of the precise sum due for rent at the time and place required by law. The demand must be made on the premises on the day it falls due, at a convenient time before sundown. *Jackson* v. *Harrison*, 17 John. 70; *Fabian and Windsor's case*, 1 Leon. 305; *S. C.*, Cro. Eliz. 209; *Kidwelly* v. *Brand*, Cro. Eliz. 48; *Crop* v. *Hambledon*, 4 Leon. 180; *Jackson* v. *Kipp*, 3 Wend. 230; *Van Rensselaer* v. *Jewett*, 5 Denio, 121; *Jones* v. *Reed*, 15 N. H. 68.

The allegation in the complaint of the demand does not show a compliance with the law, because it appears that the precise sum due was not demanded. The defendant, under the agreement, was entitled to a credit of $26, as admitted by the reply. But, even if the demand was in all respects complete, the plaintiffs had no right to possession until midnight of the 4th of November. The defendant had the whole day in which to pay the rent, and, until the day expired, could not be disturbed. *Duppa* v. *Mayo*, 1 Saunders, 287; *Kidwelly* v. *Brand*, Cro. Eliz. 73; Co. Lit. 201, b., 202, a.; *Wood and Chevers' case*, 7 Term Rep. 117; *Sweet* v. *Harding*, 4 Washt. (19 Vert.) 587.

Taking possession of the premises was a deliberate interference with the defendant's possession, by which he was deprived of the premises. The eviction was complete, (*Burns* v. *Phelps*, 1 Starkie, 94; *Luckey* v. *Frantzkee*, 1 E. D. Smith, 47; *Ogilvie* v. *Hull*, 5 Hill R. 52; *Pendleton* v. *Dyott*, 8 Cow. 727; *Lloyd* v. *Tompkins*, 1 T. R. 671; *Cohen* v. *Dupont*, 1 Sand. S. C. R. 260; *Jackson* v. *Eddy*, 2 Miss. 209; *Peck* v. *Hiler*, 14 Howard's Pr. R. 155), athough such eviction did not discharge the rent which

had already accrued. *McKeon* v. *Whitney*, 3 Denio, 452. The defendant, however, was entitled to the damages occasioned by such eviction, as a violation of the agreement of hiring, and in abatement of the rent; (*The Mayor, &c.,* v. *Mabie,* 3 Kernan, 151); and his offer to show that a representation was announced for Monday the 6th of November, and that he incurred great expense by bills and advertisements therefor, was improperly rejected. For these reasons, without reference to the other questions in the cause, a new trial must be ordered. It may be necessary, however, to consider the admissibility of evidence to show that Mario was taken sick in consequence of the plaintiffs' delay in finishing the building after the defendant took possession. The defendant hired the premises for the purpose of giving operatic entertainments, in which Mario and Grisi appeared. They had never sung in this country except under the management of the defendant, who brought them here. In the language of Mr. Paine, the plaintiffs' witness, and the plaintiffs' secretary, the great attraction was Mario and Grisi. The hiring was upon the 27th of September, 1854, and the occupancy was to commence on the 1st of October following. The plaintiffs were to use all diligence in finishing the building, which the defendant agreed to accept in its unfinished state, and this finishing seems to have contemplated the erection of fifteen furnaces for the purpose of heating the house. On the 16th of October the weather was cold, and but six furnaces were in order. Mario and Grisi, and the audience complained of the coldness of the house. Mr. Paine was spoken to about it, and went to the room of Mario and Grisi. They complained that it was bitterly cold; said they had sung in St. Petersburgh, and had never experienced such cold there. It was also proved that a sufficient number of men could have put in the whole fifteen furnaces in two days; and further, that the furnaces were not completed until the 16th of November. There is no conflicting testimony on this subject, and the conclusion is inevitable, on the evidence, that the plaintiffs did not use all diligence to finish the building. The defendant offered, in connection with these facts, to show that, on the

evening of the 16th of October, Mario was well when he com-
menced his performance, and that during his performance he
was taken with a cold and hoarseness, which prevented his going
through with his performance; that such cold and hoarseness
arose exclusively from the coldness and dampness of the house,
and that such *coldness and dampness* resulted from the neglect of
the plaintiffs to finish the building and to put the furnaces in
order; and that Mario's illness continued for about four weeks,
during which time the defendant was entirely deprived of his
services, and lost great gains and profits thereby. I think the
evidence should have been received. The sickness of Mario
was the direct consequence of the neglect of the plaintiffs to finish
the building or to erect the furnaces. Such was the offer, and,
for the purposes of this appeal, its truth must be assumed. In
*Ford* v. *Munroe*, (20 Wend. 210), the action was brought to re-
cover damages for the negligence of the defendant's servant in
driving a gig over the plaintiff's son, by which he was killed,
and, in addition to loss of service, the plaintiff was permitted to
recover the damages occasioned by his wife's *sickness consequent
upon the accident.* Justice NELSON said, in that case, that the
damages were clearly proved to have been the direct conse-
quence of the principal act complained of, and came within the
well settled rule respecting special damage. Damages actually
sustained, but which do not necessarily arise from the act com-
plained of, and consequently are not implied by the law, may
nevertheless be recovered if properly alleged. *Squier* v. *Gould*,
14 Wend. 159; *Armstrong* v. *Percy*, 5 Wend. 538. The bene-
ficial enjoyment of the plaintiffs' premises, by the defendant,
depended upon the ability of the artists employed by him to
perform the different parts assigned them, and if that ability was
destroyed by the omission of the plaintiffs to keep their engage-
ment, the loss should be borne by them. It seems that the sick-
ness of Mario resulted directly and immediately from the negli-
gence, or want of diligence, on the part of the plaintiffs, and is
less remote than the sickness of the plaintiff's wife in *Ford* v.
*Munroe, supra.*

I think the judgment should be reversed, and a new trial ordered, with costs to abide the event.

DALY, First Judge.—The averment in the complaint, that the rent falling due on the 21st and 28th of Oct. and 4th of November was, as it became due, duly demanded, was put in issue by the general traverse at the close of the answer. If the plaintiffs, therefore, meant to justify their taking possession of the opera house on the 4th of November upon the ground that they had the right to re-enter for condition broken, it was necessary for them to show that they had made a demand of the rent in the manner required by law, to operate as a forfeiture of the lease, and give the right to re-enter.

Forfeitures of this description are not favored, and to work a forfeiture for the non-payment of rent, the common law requires a previous demand of the rent due, with circumstances of great particularity. The demand must be made upon the demised premises upon the very day when the rent becomes due, before sunset, and the exact sum must be demanded, not a penny more or less;—(cases collected in Archbold's Landlord and Tenant, p. 161, and in Comyn on Landlord and Tenant, 327);—and even where demand is made, the tenant has until midnight to pay it. " The rent is not due," says Chief Justice HALE, (*Duppa* v. *Mayo*, 1 Saund. R. 287,) " until the last minute of the natural day ;" and the lessor cannot put his right to re-enter in force until the day has expired. *Maundes' case*, 7 Coke, 28 b.; *Burrough* v. *Taylor*, Cro. Eliz. 462; 1 Wms. Saund. 287 b.

The only evidence, in this case, of a demand was a notice from the secretary of the plaintiffs to the defendant, bearing date the 4th of November, 1854, announcing that " the unexpired term of your lease of the New York Academy of Music building is forfeited by the non-payment of rent due this day, and that the building is closed," which was written by the secretary to be served on the defendant on the 4th of November. There was nothing to show that a demand of rent was ever made before the 4th of November. If made on that day for the exact amount

then due for the three weeks, the plaintiffs would have had a lawful right to enter peaceably and take possession on the 5th, if the defendant had not, before the commencement of the 5th, paid up the whole amount then due; but they had no right to enter on the 4th. The secretary, Mr. Paine, testified that he was on the premises on the 4th of November to demand rent; that he was there until 6 o'clock P. M.; that he directed Mr. Tunison to close the building, and not to permit any person to enter it without an order from him or from the president of the Academy, and that he acted by orders of the directors of the Academy. Tunison accordingly locked up the building, and would not allow Mr. Hacket, or any of his company, to enter that evening. This was very clearly an eviction—a putting out of the tenant—and an entry and resumption of the possession on the part of the landlord, before he was entitled to enter, which operated to suspend the payment of the $1,000 weekly rent, falling due on the 4th of November at midnight, or any rent thereafter, until the defendant was restored to the possession. But, though this wrongful entry and eviction suspended the rent thereafter to grow due, it did not effect, suspend, or release the defendant from the payment of the rent that had already accrued, and was payable on the 21st and 28th of October, in respect to which there had been a full, complete, and undisturbed enjoyment; the rule being well settled that an eviction will not discharge the liability for rent previously due. *Boynton* v. *Bobber*, 2 Ventr. 67; American cases collected in 1 Hilliard's Abridg., chap. xvii, § 1; Comyn on Landlord and Tenant, 524. For these two weeks' rent, due before the eviction took place, amounting to the sum of $2000, the defendant was liable.

It was a part of the written agreement, or lease, that the plaintiffs were to use all diligence in finishing the house. This was an express agreement on their part, and if there was a breach of it, the defendant was entitled to recoup or counter claim his damages arising from the breach, against the plaintiffs' claim for the two weeks' rent. His offer, however, to show that Mario took cold from the coldness and dampness of the house while he was en-

gaged in a performance, in consequence of which the defendant was deprived of the benefit of Mario's services for four weeks, by which he lost great gains and profits, was, I think, properly rejected. It opened a field of inquiry in respect to actual loss, or the amount or extent of it, purely speculative and conjectural, which depended upon contingencies that might or might not happen. If the defendant had had the use of the opera house during these four weeks, and the benefit of Mario's services, innumerable causes might have occurred to interfere with or prevent the realization of profits. The offer in this case was no more than that claimed in *Blanchard* v. *Ely*, (21 Wend. 342), that the jury might take into consideration the loss of profits arising from the delay of a steamboat, and her loss of trips in consequence of the defective nature of her machinery, which the court held could not be gone into as an item of damage, being too uncertain. Damages, recoverable upon a breach of contract, are such as can be ascertained and fixed with reasonable certainty; (*Griffin* v. *Colver*, 16 New York R. 489; *Freeman* v. *Clute*, 3 Barb. S. C. R. 424); and that cannot be done in respect to profits anticipated from the future public performances of a vocalist, any more than it could be done in respect to profits anticipated from the running of a steamboat if she had been in a condition to prosecute her regular trips.

I think otherwise, however, in respect to the offer to show, that when the plaintiffs took possession of the opera house on Saturday the 4th of November, that the defendant had announced a representation of the opera of " Semiramide " for the Monday evening following, and had incurred great expense in bills and advertisements when he was deprived of the house by the act of the plaintiffs. This was an item of damage that could be easily ascertained; and I do not see upon what principle this evidence could be excluded. There was sufficient evidence in the case to warrant the jury in finding that there was a breach of the agreement to use all diligence in finishing the house, and the expense and loss the defendant had been put to, by bills and advertisements, he was entitled to prove, and have deducted

from the plaintiffs' claim for rent. Unless this expense should exceed the sum of one thousand dollars, the defendant will not be greatly benefitted by a new trial. But that is a matter for his consideration. He asks for a new trial upon the ground that this evidence was excluded, and. in my opinion, he is entitled to it; and I therefore agree with Judge BRADY, that a new trial should be ordered.

HILTON, J.—The damages claimed as arising from the illness and inability of Mario to perform were, I think, too remote, and evidence in respect to them was properly excluded. *Griffin* v. *Colver*, 16 N. Y. R. 489. Besides, it is a general rule that a tenant occupying premises cannot, in an action for rent, be permitted to claim that they were unfit for habitation, or for the purposes intended by him at the time of hiring, in abatement or extinguishment of the demand for rent. *Edgerton* v. *Page*, 1 Hilton R. 320; *Moffat* v. *Smith*, 4 Com. 126; *Cleves* v. *Willoughby*, 7 Hill, 90; *Westlake* v. *Degraw*, 25 Wend. 669; *Mumford* v. *Brown*, 6 Cow. 475.

It is admitted by the pleadings that the rent, as it became due, was duly demanded. The action is brought and the recovery is had for rent due, and duly demanded and unpaid. Conceding, then, that the rent due November 4th was not actually due on the afternoon on that day when the defendant was deprived of the possession by the plaintiffs, there still remains the forfeiture arising from the non-payment, and due demand of the rent falling due October 21 and 28, as admitted by the pleadings, which no subsequent acts of the plaintiffs waived; and as the peaceable eviction of the defendant subsequent to this forfeiture was not wrongful, his claim for damages arising out of what took place on November 4th was therefore properly excluded.

Indeed, it would seem that the verdict of the jury was based upon the assumption that the lease had terminated and become forfeited by non-payment of rent on October 21st, as their verdict is only for the amount owing for the two weeks' rent, after de-

ducting the sum claimed on account of new scenery, and what was admitted to be owing for amphitheatre tickets.

I think the order appealed from should be affirmed.

Order appealed from reversed, and new trial granted.